May it please the Court, I'm Mike Fowler, trial and appellate counsel for David Mark. We have raised three issues on this appeal. The first and foremost is the informal immunity and its alleged breach. Secondly, the issue of sufficiency. Third, forfeiture, or the issue with respect to the excessiveness of the forfeiture. With respect to the latter, to the forfeiture, the Court itself has asked us to address whether the Court's failure to make David Mark's $62 million forfeiture joint in several constitutes plain error. We think it clearly does. But I need to focus the Court on something. I'm not sure, again, I'm not sure the Court realized it. I didn't until this last weekend. That was the intent of Judge Proulx, to make it joint in several. What happened is if you look at Excerpt 3 of our record excerpts, which is not the amended judgment, but is the actual, the original judgment on the date of sentence, and if you look at page 6 of that, the form is, I don't know if, I didn't really notice it before preparing for the argument, but they have it on page 6 is the schedule of payments. At the very bottom of the page it refers to the $62 million forfeiture judgment. If you look just above it, you see where it's checked off, or actually an X mark, for joint in several. And they, and he lists, he, Judge Proulx, lists the joint in several co-schemas who it should be joint in several with David Mark. Now, you could argue that that just relates to restitution. I suggest it doesn't. And I tried this case. And the one thing, Your Honors have read Judge Proulx's order with respect, what his attitude is, is to the government's dealing with the forfeiture. There's no way Judge Proulx would have made but a $200,000 restitution judgment joint in several and not made that $62 million joint in several. So to make, very briefly, I mean, what I'm saying is this was his intent to, I think what the Court is left with is simply sending the case back to verify whether that was or wasn't. Or interpreting it to mean joint in several. I'm sorry, Judge. Or interpreting it to mean joint in several. Exactly. But I don't think it's a very complex issue. I think he meant to do that when he filed the amended judgment. It was simply to change what had been the April 16th original judgment of forfeiture from $107 million down to $62. The government, being very generous, had reduced that amount of $107 to $62 before the actual date of sentencing. So it took me a minute to get to page 6. Could you explain again where you think it says joint in several? I'm just trying to follow what your argument is about this page of the record. I think you pointed us to page 6 of the ER. Page 6 of the look at excerpt 3, our record excerpt 3, appellate's excerpts of the record in volume 1, item 3. Item 2 is the amended judgment. Item 3 is the original judgment. And at page 6, I don't think there's a page 6 different numbering on the amended. So what I'm looking at, have you seen it, Judge? I think I might. I'll have to look it up later. My ER page numbering, page 6, I don't see anything about joint in several. It's the page that has it at the top, schedule of payments. Oh, okay. That's our page 7. Okay, so I have schedule of payments. So where does it say joint in several? It says joint in several. There's an X mark right next to it. And then right below joint in several, it says joint in several with co-schemers. And he names Grimm, Mazarella, Beecroft, Thompson, Ortiz, and Panica. The one I have doesn't have an X next to it. That's not on what I'm looking at, so we'll have to look at it later. Okay. Candidly, Your Honors, I wish I didn't have to spend most of my, so much of my time on this. But we felt obligated to address what the Court has asked us to address. So if I may, I would at this point turn to what I think is an absolutely critical issue for this Court. It's whether the government carried its burden of proving a breach of the conceitedly informal prosecutorial immunity it had bestowed upon David Mark and his fiancee in a non-memorialized meeting in early March of 08. And it was done in the presence of agents. And just the chronology is somewhat important in this case, very important. I think we're pretty familiar with the chronology, but I guess my, one of my questions that I'm just, I just find hard to believe. I'm sorry. I find hard to believe that Mr. Mark did not tell you about this. You've got, I'll explain. A, Mark is an attorney. He's a young attorney. He has as much knowledge as my 4-year-old child about criminal law. But what he, what happened, it was a throwaway line. Of course I debriefed him. And it was, it wasn't, do we have immunity? The word immunity was never mentioned by Brian Pugh. It was, where do we stand? And we being himself and his fiancee Kim stand right next to, they had been, you know, with Pugh. That was the second meeting he had had. They'd had one with the FBI in November of 07. It was, where do we stand? And so long as you tell the truth, you're fine. That was it. There was no way to, to what he told me. And the court conceded I did not know. And that you, that we were not told. And when you look at the chronology. No, but I, so you weren't representing him, I take it, when he was cooperating. No. All right. He had no attorney. This is all taking place. So then he gets a target letter. He gets a target letter in August. Right. And when do, when are you appointed in this chronology? When do you. When are you retained or appointed? Three days after he gets the target letter. All right. And so it seems like one of the logical things would be, hey, I had been talking to the prosecutor and cooperating. And he told me that. And there's evidence, it's clear evidence, he had, he cooperated. And you can have a three, we have a 302 in November 07. In March of 8, the FBI agents bring him to Brian Pugh. It's at that meeting, a non-memorialized meeting with the prosecutor, with an agent present, that the immunity, what the judge found to be an immunity, what Brian Pugh conceded was an informal immunity grant, occurred. And the court, of course, had subsequently found we didn't know there was immunity. But the proof of why, what you have going on at three years past, they're getting ready to try Grimm and Mazzarella, which I think your honors understand, Grimm and Mazzarella before your honors. And I think Mazzarella's been argued, Grimm has not yet been argued. But they're the major conspirators in this case. Three years past, we're going to go to trial. They're going to go to trial. The government is a Grimm and Mazzarella. They called David up and wanted to brief him with respect to his being a witness. Totally cooperative. We have a 302 to that effect. It's in the record. February 1 of 2011. We now fast forward. The next thing we know, the next thing David knows, I know, is the target letter. I get the target letter and immediately call Brian Pugh and set up a meeting to see if I can convince him that this man should be a witness, not a target. What's going on? I meet with him on September 13 of 2011. There's never a mention, no mention, and the record's clear on that, that there was an immunity or there was a breach. There's no mention of this July, ostensibly or alleged, July phone call. They reject my plea that he become a witness. We have some plea negotiations. Never in the series of emails is there any mention of immunity, any mention of a breach. He's indicted, by the way. Before he's indicted, Grimm and Mazzarella are prosecuted. And this same prosecutor conceals, that's the only word you can use, conceals from the attorneys in Grimm and Mazzarella that their key witness, Kim, Kim Brown, I may have the wrong last name, the fiancee, was their critical witness. They never revealed that there was an immunity grant. What could be a more obvious requirement under Brady and Giglio that you would reveal that? This prosecutor intentionally concealed it. What then happens, we go through discovery, 500,000 pages of discovery, nothing about an immunity, nothing about a breach. We're into the trial. It started in March of 2013. Five days into trial, Kim is on the witness stand, testifying against her former fiance. And it's only on the fifth day of trial, in the final portion of the cross-examination, when Brian Hughes starts asking a question about what did she get in return for her testifying, I object. Because the question was put, what did I tell you that I was concerned about his making himself a witness? Be that as it may, we go off the record. I don't mean off the record. We go into a discussion, a sidebar, or at least the jury's excuse. First time, first time we ever hear that Kim has immunity. If Kim has immunity, you don't need to be a genius to know, and it was bestowed in that March 8th meeting, David did too. And that's what gives rise to this whole situation. At first, Hughes suggests, oh, he has a memo back in his office documenting this. It never happened. They come up with nothing. That's the first time, then, that this July phone call and memo are on the table? He didn't even tell us about it then. It's now July 15th. That's the date this all happened. We then meet upstairs. The judge says meet. There was some issue about 302s and whether we had them all. We go up there. I go up there with co-counsel, and the prosecutors are there. And at that time, it's the first time that there's any mention that there has been an immunity grant, not only as to Kim, which they admitted earlier that day, but as to David as well. Brian Pugh testifies to that ultimately at the hearing, and I testify as well. I'm a witness at the March 28th hearing. In any event, they do not mention the July call at that time at all. You look at our briefing. There's no issue about that. The next week was a week off for trial. The judge had to go. Judge Pro had to go to some conference. During that week, I make a motion for a motion to dismiss based on the grant of immunity. Only the first time there's any suggestion of a breach is that the government's opposition to our motion, which was in early, late March. So if we agree with you that there's a problem here because of the phone records that you submitted that seem to suggest that there may not have been the call that the government said, shouldn't we remand for an evidentiary hearing on that issue? I'm struggling with how we could actually just dismiss at this point rather than remanding. The answer is yes, that would be fine. But remember, the whole issue on the March 28th hearing is the existence or nonexistence of the July telephone call, which, by the way, once again, an agent testified he had no such recollection. He was there. And it's once again nonmemorialized. By the way, I didn't mention something to you. It's a nice little tidbit. In the September meeting, there is no 302. The September meeting when I first meet with you. But there are notes that the agent then was forced to turn over when we got into this whole thing. And at the top of the notes, it says no 302 of this proceeding. I've been trying cases a long time and doing criminal work. So I am trying to figure out the role of the or what happened with the FBI agent. Which, I'm sorry? The FBI agent at the July meeting. He had, they had trained, there were three different FBI agents. They were one substitute for another. By July, it was a man named Agent Sean Jones. He got on the stand, he was put on the stand. He had no recollection of any such phone call. He's the agent to whom Brian Pugh asked to deliver the target letter. So I'm just saying that he was the agent at the time. And he was also present on September 13th. It's his notes that says 302 done in Brian Pugh's direction. Did anybody ask the FBI agent why they were rescinding the cooperation, the immunity? Why they were rescinding the immunity? Because of the alleged breach. The non-existent breach of July. I have no, I understand your question. Why would they do this? I can't answer it. And I'm just looking specifically for any reference in the record with respect to. I have no time. The FBI. Can I keep going? You can continue to answer the questions, yes. I would just have liked the time that I needed on the forfeiture. Back. You forfeited that. No, it's not. You know, we're trying to get to the bottom of the issue. So we're going to spend the time we need. I cannot. I'm sorry, Judge. So what was in the record? I mean, in the record, the FBI agent, is that just it, that he had no recollection and didn't question at all why they were rescinding the immunity? The question there was an assistant. I'm sorry, Sarah, I forgot her last name. Griswold. Griswold, I'm sorry. Short-term memories. But she was asked a specific question as to why, and there was no response. Nobody ever gave a reason except this alleged breach, this alleged phone call. David. Wait, but when this first came up during trial, and you went, it sounds like you went up to the judges' chambers, it sounds like they admitted there was an immunity deal. But what did they say at that point about why there was no longer an immunity deal? At that point, for the first time, Pew testifies about the July meeting. We had an incident that there was a suggestion in their opposition memo that there was a breach, but no specifics. Pew, at March 28th hearing, for the first time, describes how this happened. No, no, no. But I thought you said during trial, when Kim is on the stand, she says, I was given an immunity deal. So then didn't you go upstairs immediately? Didn't you just tell us you went upstairs that same day? So what happened upstairs? What did the government say upstairs about why there was no longer an immunity deal? They didn't say, but just to correct you. So did you ask? Why? There was no suggestion of a breach at that point. So did you say, why are we here? Let's just step back. Wait. Wait just a second. Would you just step back? You're in trial. The testimony of the fiancee-girlfriend prompts the break in the meeting, correct? Is that right so far? Wait, let's just go in phases. There's a break, okay? There's a break, and then we meet. You go up. We come back to court. Okay. He went without the jury, and simply said he had found some memo of this March immunity session. He can't find it. We're talking with the judge. The judge says, go upstairs, iron out the issue of the 302s, and then come back. Okay. Only I go upstairs, and they confirm the Kim immunity. And you could have knocked me over with a pin when they told me David also had an immunity. Okay, so now at that point he has immunity. And then when does the discussion first come up as to why he no longer has immunity and why they charged him? That discussion never occurs. The prosecutor, let me put it this way. Wait a second. There was no love lost between us. Okay. And there's never any statement by him why. It's just that, as we all know, there's a July alleged call at which he is supposed to have breached. No, no. We're trying to get the chronology. So you're at the meeting. You find out that not only your client but Kim both have immunity. Pew admits that, right, at that point? Okay. And then he comes down and he testifies, however. He testifies that he made the phone call. Both of them in this farewell or as they're exiting, both had immunity. Okay. Well, that's established. Now we're looking at the phone call in July and the breach of immunity. So when do you first learn of that? That's the day he testified. Okay. At the hearing later, though. So I'm still struggling with when you first heard that they had immunity, why didn't you say then, not later at the hearing, but then, why are we here? I'm in a 4 o'clock meeting. I'm shocked to hear my client has immunity. Okay. In all the candor, I mean, there wasn't much discussion after that. We broke. We were broke for a week. I took that and made a motion to dismiss. Okay. They then, in the opposition, and it's someplace in the record I could show it to you if you need to, simply allude to there being a breach. No details. We then have the hearing that Judge Proulx ordered on March 28th, and for the first time we have the specifics. By the way, at no time did Judge Proulx ask the question that's concerning all. Nobody said, well, you know, why did he breach? Well, not even you. I'm sorry? Well, did you? I, well, very simply, I think they're lying about the breach. Just as simple as that. Well, why don't we hear from the government? Will I have some chance on rebuttal? You will. Thank you. Thank you for the additional time. I appreciate it. Could you begin with the immunity issue, please, since we're on the trail of that right now? Yes, Your Honor, certainly. David Mark came in to the FBI in November of 2007 with his then-fiancee, Kim Brown, and ratted out Eve Mazzarella, his boss. He then goes to former AUSA Brian Pugh in March 2008 with Kim Brown, and again rats out Eve Mazzarella and again admits his own responsibility. As that meeting's breaking up, David Mark says something along the lines of, what's going to happen to me? And the former prosecutor says, if you keep cooperating fully and truthfully, you're not going to be prosecuted. Nothing happens until, well, nothing relevant to this conversation happens until February 1, 2011. I'm sorry to interrupt you, but do you agree at that point that he has immunity? Certainly. Okay. Please continue. There's a teleconference February 1, 2011, and at that teleconference David Mark performs again. He recalls every bad thing Eve Mazzarella, his former boss at Distinctive, did. He admits his own responsibility. The Grimm-Mazzarella-Beecroft trial at that point was getting ready to go, but it's continued. There's a teleconference in July 2011, and this is what it all comes down to. Well, there's an alleged teleconference. Alleged teleconference. Yes, Your Honor. Well. There's a teleconference for which the U.S. attorney has no notes, is that correct? That's correct. The U.S. attorney can't remember who the FBI agent was that was there, correct? Correct. And the U.S. attorney says, as I recall, he made that phone call from the conference room, correct? Yes, Your Honor. The U.S. attorney conference room, and he made it to the number that he normally called Mr. Marquette. Did he say that? I don't recall if that was precisely what he said, but I will say that if you look at excerpts of record page 117, the affidavit to one of the affidavits to Mr. Fowler's motion for reconsideration is a friend of David Marquette, who says from March to December of 2011, David was in New York with me. There is no doubt they can't recall which FBI agent was in the room, and they can't. Well, they is you. They is the government. Yes. Okay. Correct. And so solely on the strength of Mr. Pugh's testimony, in which he can't recall any details and he has no documentation, and Mr. Marquette says that the phone call, Mr. Marquette said it didn't take place, then how has the government in any way shown a breach of the immunity agreement? Well, Your Honor, the answer is twofold. First of all, we have the in-court testimony of not just former AUSA Pugh, but AUSA Sarah Griswold. And AUSA Pugh said he remembered nothing in July. His answers were consistently that I didn't remember. But he said this happened on a phone call that was made from the U.S. Attorney's office to the cell phone that they always called him at. And we know now that that call didn't happen. At most, Your Honor, correct, at most, Your Honor, he misspoke. And I agree. At most, he misspoke. At most, he misspoke. What's the evidence of any phone call? Just kind of read. Why don't you just tick off so I can make a list all the evidence that such a phone call took place that the government has? AUSA Pugh's testimony and AUSA Griswold's testimony, he mentioned some sort of medical condition, but his general response to every question in the July teleconference was a hem and a haw, and I don't remember anything. And I — So in other words, we have — you're basically saying that the testimony of the U.S. Attorney who can't remember anything, who doesn't have any notes, that that basically is enough? I mean, is that the bottom line that we should then evaluate as a matter of law? Yes, in view of Judge Proulx's factual finding that the July 2011 teleconference did take place. Well, but he made that factual finding without knowing that there was no support or evidence contrary to — directly contrary to what the AUSA said, and that being that they called — there's specific language in the transcript that says we call from the speakerphone in the conference room. I know that subsequent to that, he's made modifications in terms of what could have happened, but that coupled with the fact that there's no written notes from either the AUSA, either of them, or the agent, and the agent on top of that has no recollection, doesn't it — So on top of this, we have the AUSA violating a U.S. Attorney guideline in not making notes, in saying that — something that's not supported in the evidence, and we're supposed to review whether or not there was an abuse of discretion by the trial court in not granting a motion for reconsideration. Now, I'm afraid I've lost the thread of Your Honor's question. Well, with all of this evidence that's — has been brought out, you know, before both Judge Pro and now for us, I think our question here is to determine whether or not there was error in the district court's denial of the motion for reconsideration. Isn't it? Isn't that our question? Yes, Your Honor, that's correct. All right. And I would respectfully submit that the answer, despite the AUSA's not writing it down properly and documenting — At all. Actually writing it down at all. At all. Or documenting it at all. At all. Or identifying the FBI agent. What we have here — And an FBI agent not recollecting it at all, so therefore not writing anything at all. All of that is correct. At the end of the day, however, we still have, immutably, two witnesses who went in there and said, this absolutely happened. And you have two U.S. attorneys who can't document anything versus a defendant who said it didn't take place. And I take it that if there were any documentation of a phone call that originated at the U.S. attorney's conference room, that that would have been produced in all fairness, correct? Certainly. So there is none. I believe Your Honor is correct. There is none. Go ahead. And we have that the AUSA is absolutely incorrect and wrong in testifying specifically that the call was generated from the speaker phone in the conference room. To the number that they usually called him at, which was the cell phone we know from the earlier records. The Louisiana cell phone. That may have been the case. That was the case. Do you want to look at the excerpt of the record? Do you deny that that's what the AUSA said? He called him at his telephone number from prior interviews. Now the U.S. attorney has those phone records. Is there any phone number where he was called other than his Louisiana number in the prior interviews? I don't believe the record contains that information, Your Honor. So in other words, there's an absence of any other record. That is correct. Okay. I would also note, Your Honors. And if the U.S. attorney is so confident about what occurred, and I understand Mr. Pugh is a former U.S. attorney at this stage, is that right? Yes, Your Honor. Okay. If they're so confident, then what's the hazard of an evidentiary hearing to get to the bottom of this one way or the other? I don't believe there's a hazard to Your Honor's proposal. I merely believe it's not necessary to reach that remedy. I would also respectfully point out, Your Honor, that in contrast to former AUSA Pugh's and AUSA Griswold's clear and unadorned assurance that this happened and David Mark pretended to forget everything, David Mark said at supplemental excerpts of record 432, at least to my memory, and then again supplemental excerpts of record 457, 459, I can't recall and I'm pretty sure that it did not happen at all. Your Honors will note, therefore, that David Mark, who testified at the evidentiary hearing, left himself an out. The two AUSAs, admittedly having not documented a thing or recalled who was in the trial, the fact that Kim Brown was David Mark's fiancée and standing next to him when David Mark said, what's going to happen to me, that was not disclosed and that as Judge Friedland knows, it was a subject of many minutes of oral argument in the Mazzarelli case. Was there no obligation on the part of the AUSA to inform or to discuss with the counsel for Mr. Mark that Mr. Mark had been given immunity previously, but it didn't bear out and so that's why they rescinded it and that's why they were going to trial? I don't believe there was any contractual obligation to give notice of it, but the target letter itself provided de facto notice of it. No, the target letter did not say, and this is because. Or it didn't say that you had been given immunity previously. It just said, we are now proceeding to prosecute you. I mean, is that the type of practice that happens in this U.S. Attorney's Office? No, Your Honor, and. So this is an exception. Yes, Your Honor. And it's an exception because it's not really the best way to proceed, correct? That is correct, Your Honor. All right. It's certainly not the best. And so you're arguing it wasn't unlawful probably that he didn't inform him and it wasn't a violation of law that there was a rescinding of the immunity under these bases, but we're here on another question, and that is at a very critical point in this proceeding, in this investigation and leading up to trial, Mr. Mark had been given immunity. Immunity, saying that he would not have to face charges in court, would not have to go through trial, and no one ever made it sufficiently clear to his lawyer that he no longer was under this protection of immunity. Especially in light of everything else going on, it's pretty remarkable that there was no written note, not one, by anybody on behalf of the government that reflects this. Is that correct? That is correct, Your Honor. I suppose the opposite assumption is it's pretty odd that if he has an immunity that nothing happened to cause the prosecutor to decide to send a target letter. That's correct, Your Honor. So, I mean, it makes what happened here makes sense if there was some interim event. It's just that we can't document what may have occurred at an interim event, right? That is a correct assumption. And it is the government's burden, correct? Yes, Your Honor. And that just underscores my point, and maybe I wasn't doing my best to make it, but there very well could have been a reason. But there's no proof here by the government that of any documentation or anything that would have led to them rescinding it, and that's how we're looking at it now. Your Honor is correct. And Your Honor pointed out there's no documentary evidence. There's testimonial evidence that this was the case, and that ---- But the problem with the testimonial evidence is now we have evidence that doesn't support it. Your Honor, I believe we have ---- Your Honor is correct in Your Honor's recitation of what the former AUSA said at the evidentiary hearing about dialing. The evidence does show, and it was raised in the motion for reconsideration, that there was no call initiated from the U.S. Attorney's hard line to David Mark's telephone number in Louisiana. And, indeed, our office went and checked both ways, anywhere in Louisiana, going both ways, and that was negative. This was after the evidentiary hearing, but it points, I believe, squarely to the fact that the former AUSA was wrong, and some sort of call was set up with Mark in New York, and this is the call at which Mark said, I can't remember a name. Well, did your office look at those records, at other possible records? I don't believe ---- I'm going beyond the record now, but I believe the answer is no. Okay. But your answer is to Judge Merguia about how usually the AUSAs would take notes, and usually a target letter would explain that someone had breached. Don't those things at least mean that since we don't have such notes, we should have an evidentiary hearing to explore this further? I mean, I'm struggling with why we shouldn't at least have an evidentiary hearing, especially given those answers. And the only way to answer Your Honor's question is to say that for whatever happened to David Mark between February and July of 2011, he decided on his own he wasn't going to cooperate anymore. And when the briefing started, his defense became not that I had that July 2011 teleconference, and at that conference I cooperated fulsomely once again. Well, he says there was no conference at all, right? That's the defense, and that's why I can't imagine that at a further evidentiary hearing in light of the one we just had, anything else is going to get unearthed. I believe Judge Pro and I ---- Well, let's say nothing else is unearthed. How is it possible that you could determine the government met its burden of proof on this record? I would respectfully submit, Your Honor, based on the testimony of the two AUSAs, that this absolutely happened, and he absolutely pretended to remember nothing. So in other words, without an evidentiary hearing, the government would be willing to stake its claim and to say the burden of proof was met, no further evidentiary hearing is needed. Correct, as Judge Pro found. Thank you. I think we've exhausted the subject. Thank you very much. You have two minutes for rebuttal. If you could put two minutes back on the clock, please. I think it's worth remembering that it's Pugh and Griswold who concealed the Kim immunity in the Grimm-Mazzarella case. That's not ---- I don't like attacking people individually. But they kept, when Ms. Griswold was asked, why didn't you reveal it in the Grimm case, she said, I don't know. That's in the record. And to make up this story of David being in Grimm, it's a figment of their imagination. The testimony is clear. We've cited it. I don't think we need to do it again. Well, it wouldn't matter if he was in New York or Washington, D.C. It makes no difference. If there's no documentation of a call, correct? The interesting thing is ---- Do you want to just keep arguing or do you want to answer the question? I'm sorry. Okay. My question is, would it matter whether he was in New York, Washington, or anywhere else? Absolutely right, Judge. It makes no difference. Their testimony is categorical. You press the button in the conference room, in the presence of your peers there, the agents there, and it's David's voice at the other end. And it's as simple as that. What I did, as soon as that was over, while I was still going on, I subpoenaed the records that we now know exist. The government never, on their own, if they wanted to corroborate, it was obvious the July call was critical. They could have gone and gotten records to say, look, here's the record of the call. Only when we subpoenaed it did we get it. And there's a categorical record. Interestingly, of course, the February 1st call, which he's cooperating, is in the record. And the July call doesn't exist. We asked for June and July. There is none. And then they finally, in May, came up with a much larger record, which corroborated our position. Contrary to what Mr. Levitt said, the testimony, what David did say, well, he's saying, to the best of my recollection, it did the call. But I'm reading from page 16 of our brief. I asked, you've heard some testimony about a phone call in which you ostensibly had no memory. You heard the testimony, David Mark. I have heard that. Me. Has any such call, had any such call occurred? One word answer, no. All right, thank you. Your time has expired, and I think we have the arguments from both sides well in mind. Appreciate the arguments this morning. The case of United States v. Mark is submitted.
judges: McKeown, McKeown, Murguia, Murguia, Friedland, Friedland